<u>NOT FOR PUBLICATION</u>                    [Dkt. Ent. 52]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

| | |
|---|---|
| COALET LOWE,<br><br>       Plaintiff,<br>    v.<br><br><br>MEDCO HEALTH SOLUTIONS OF<br>WILLINGBORO, LLC.,<br><br>       Defendant. | Civil No. 10-4823<br>(RMB/AMD)<br><br><br>**OPINION** |

Olugbenga O. Abiona, Esq.
1433 South 4th Street
Philadelphia, PA 19147
     Attorney for Plaintiff

John James Peirano, Jr., Esq.
Vimal Kumar Shah, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962-2075
     Attorneys for Defendant

**BUMB**, United States District Judge:

     Plaintiff Coalet Lowe alleges that his former employer,

defendant Medco Health Solutions of Willingboro, LLC ("Medco"),

terminated him due to his race in violation of 42 U.S.C. § 1981

(Count I) and the New Jersey Law Against Discrimination ("LAD")

(Count II).  Plaintiff also asserts a retaliation claim under the LAD on the grounds that Medco terminated him for corroborating a sexual harassment complaint against one of his superiors (Count III).  Medco now moves for summary judgment as to all three claims as well as Plaintiff's request for punitive damages.  For the reasons that follow, the Court denies Medco's motion with respect to Counts I and II and reserves on its motion with respect to Count III and punitive damages.

## I. BACKGROUND[1]

### A. Medco's Investigation and Termination of Plaintiff

Medco is a subsidiary of Medco Health Solutions, Inc., a company that manages pharmacy benefits and provides pharmaceuticals by mail order.  Plaintiff, an African American man, worked as a security supervisor at Medco's facility in Willingboro, New Jersey, from 2000 until his termination on March 26, 2010.

At the time of Plaintiff's termination, Alyssha Harvey worked for a vendor company that provided cleaning services for Medco.  Harvey testified that in March 2010, she reported to Medco Security Officer Shonda Bittle that, a couple of days

---

[1] All background facts are drawn from the affidavits and depositions submitted by the parties, as well as their Statements of Material Fact (under Local Rule 56.1), and are construed in the light most favorable to Plaintiff.  See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004), cert. den'd, 543 U.S. 956 (2004).

earlier, Plaintiff had "smacked" her on her "butt" and grabbed her wrists.[2] (Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 13.) Bittle reported Harvey's complaint to Medco's security manager, Nicholas Rossino.[3] (DSUMF ¶ 14 (citing Rossino Dep. Tr. 217:4-10, Def.'s Ex. 20); Bittle Dep. Tr. 61:7-20, Pl.'s Ex. P.) Rossino reported Harvey's complaint to Medco's human resources business partner, Robert Greiner. (DSUMF ¶ 15.)

---

[2] While Plaintiff challenges the substance of Harvey's allegations, he has not disputed that Harvey made this report to Bittle. Instead, he vaguely asserts that "Harvey has made several inconsistent allegations". (Pl.'s Resp. to DSUMF ¶ 13.) Since Plaintiff has not disputed that Harvey reported the alleged conduct to Bittle, the Court deems this fact admitted pursuant to Local Civil Rule 56.1 ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."). Indeed, Plaintiff's responsive statement of material facts reflects that he has consistently ignored the purpose of this statement – to "indicat[e] agreement or disagreement" with Defendant's version of the facts. Local Rule 56.1. Rather than accepting or rejecting each fact, he has instead improperly argued the merits of the motion. Accordingly, to the extent Plaintiff has not indicated actual disagreement with the facts asserted by Defendant, they are deemed admitted. Id.

[3] Although Plaintiff disputes this fact, he has proffered no facts or evidence to the contrary, and the Court cannot credit his baseless assertions. Bittle expressly testified that she reported Harvey's complaint about Plaintiff hitting her to Rossino. (Bittle Tr. 61:7-20.) Plaintiff also mischaracterizes Bittle's deposition testimony, claiming that she testified that Rossino and Janelle Auten, Plaintiff's fellow security supervisor, told her that Plaintiff had touched Harvey inappropriately. (Pl.'s Resp. to DSUMF ¶ 14 (citing Bittle Tr. 59:2-10, Ex. P).) However, Bittle actually testified that Rossino or Auten told her that Plaintiff had been terminated because he had inappropriately touched Harvey. (Bittle Tr. 58:6-59:10.)

On March 24, 2010, Greiner, with Rossino's assistance, commenced an investigation into Harvey's complaint.  They interviewed Harvey, who told them that Plaintiff had struck her and grabbed her wrists. (DSUMF ¶ 18.)  According to Greiner's deposition testimony, Harvey described the incident as follows:

> A.   In general, the best I can recollect, she went out to the office on the receiving dock area. Mr. Lowe was in the office.  She entered the office.  They began having a conversation.  The conversation became angry, heated.  <u>She poked or slapped Mr. Lowe.</u>
>
> Q.   That's what she told you?
>
> A.   Yes.  <u>She made physical contact with Mr. Lowe and then turned around to walk out of the room, at which point he struck back at her and made contact with an open hand on her buttocks.  She turned around in anger to confront him, raised her hands up in front of him.  He grabbed both of her wrists.  He released her hands or she pulled her hands away.  She punched him on the shoulder.</u>  And I'm characterizing that.  I don't know the force of it or whatever.  And she walked out of that room.  Several minutes later she determined that she had left her radio behind, walked back into the room to get her radio from where she had left it and left immediately.

(Greiner Dep. 88:7-89:6, Def.'s Ex. 18 (emphasis added).)[4]

_____

[4] Plaintiff does not dispute the substance of Greiner's testimony but argues, without any citation to case law, that it constitutes hearsay.  Federal Rule of Evidence 801(c) defines "hearsay" as an out-of-court statement offered in evidence "to prove the truth of the matter asserted."  It appears Medco proffered this evidence not to prove the truth of Harvey's allegations, but to establish Greiner's knowledge of this complaint at the time he recommended Plaintiff's termination. In the employment discrimination context, such out-of-court statements are regularly admitted to show the state of mind of the person making the employment decision, a critical factor in

Harvey drafted the following statement at Greiner's request:

> On the day of Friday March 19, I was on the shipping dock talking to Coalet Lowe.  He was telling me about Visha[,] and Antone[, and] me (Alyssha Harvey) [and] about the rum[o]rs going around[.]  [A]s I went to get up he smacked me on my but[t.]  [W]hen I went to push his hands away he grab[bed] my wrist.  I pulled my wrist out of his hands[,] then left.  I came back to get my radio, then left again.
>
> Alyssha Harvey
> 3/24/10

(Def. Ex. 7.)  Notably, Harvey's written account omitted two facts, which she had conveyed to Greiner (according to his testimony): (1) that Harvey "poked or slapped" Plaintiff before he hit her, and (2) that Harvey "punched" Plaintiff on the shoulder after he slapped her.  (Compare Greiner Dep. 88:7-89:6 with Def. Ex. 7.)

Greiner took the following notes based on his conversation with Harvey:

> Comments she did not like –
> punched arm –
> Turned to leave ---
> slapped (open handed on

---

such cases.  See, e.g., Jones v. Univ. of Pa., Civ. No. 00-2695, 2003 WL 21652083, *4 n.3 (E.D. Pa. Mar. 20, 2003) ("[S]o long as complaints received by an employer are offered to show the state of mind of the employer (a crucial factor in discrimination cases), and not offered to prove the truth of the matter asserted, such complaints do not constitute hearsay.") (citing Hardie v. Cotter & Co., 849 F.2d 1097, 1101 (8th Cir. 1988)); Sunkett v. Nat'l Gypsum Co., Civ. No. 09-721, 2011 WL 6719776, *16 (D.N.J. Dec. 21, 2011).  Accordingly, Plaintiff's objection is denied.

buttocks)
Turned to protest
Grabbed both wrists in
hands –
Let go / broke away / left.

(Greiner's Handwritten Notes, Pl.'s Ex. P-24 at p.3; Greiner

Dep. 87:12-15, 93:15-94:12.)[5]

In a phone conversation on March 24, 2010, Greiner reported

what he had learned from Harvey to Robin Kaminski, the human

resources manager for Medco Health Solutions, Inc.  (DSMF ¶ 23.)

Greiner and Kaminski both testified that during this

conversation, Greiner conveyed that he found Harvey "extremely

credible".  (Kaminiski Dep. 106:15-107:4, Pl.'s Ex. 19; Greiner

Dep. 84:10-14, Pl.'s Ex. 18.)  According to Kaminski, Greiner

explained that he found her credible due to her attention to

---

[5] Plaintiff objects to this exhibit on hearsay and authentication
grounds, although notably he has proffered the document himself,
thus undermining his objections.  The Court dismisses his
hearsay objection for the same reasons discussed supra at n.4.
The Court also rejects Plaintiff's claim that this document was
not properly authenticated.  The Third Circuit has "repeatedly
noted that 'the burden of proof for authentication is slight.'"
Lexington Ins. Co. v. Western Pa. Hosp., 423 F.3d 318, 328 (3d
Cir. 2005) (party proffering evidence need only make "prima
facie showing" of authenticity and need not present "full
argument on admissibility") (emphasis in original, internal
citations omitted).  Greiner authenticated these notes during
his deposition pursuant to Federal Rule of Evidence 901(b)(1)
(testimony of witness with knowledge that item is what it claims
to be satisfies authentication requirement).  (Greiner Dep.
93:15-94:12.)  Further, the Medco Bates stamps on these pages
indicate that they were produced by Medco during discovery,
which is also probative on the issue of authentication.
McQueeney v. Wilmington Trust Co., 779 F.2d 916, 929 (3d Cir.
1985).  Medco has therefore satisfied its minimal burden of
establishing authenticity.

detail in describing the event.  (Kaminski Dep. 106:21-107:4.)
Kaminski took notes regarding this conversation, which support
her testimony.  (Pl.'s Ex. P-26; Kaminski Dep. 99:11-13, 103:3-
20.)[6]

As part of the investigation, Greiner interviewed two
people whom Harvey said would have either witnessed the incident
or been in the area at the time it occurred, security officer
George Williams and a pharmacist who worked in the receiving
dock whom Greiner knew to be Joseph Centolla.  (DSUMF ¶ 25
(citing Greiner Dep. 97:1-22, 104:11-21); see also Greiner Dep.
106:20-22, 106:23-107:6.)  Centolla told Greiner that he did not
witness any incident between Plaintiff and Harvey.  (DSUMF ¶
26.)  According to Williams' deposition testimony, he reported
to Greiner and Rossino that he had observed two incidents
involving Harvey and Plaintiff.  (Williams Dep. 35, Pl.'s Ex.
E.)  First, he told them that on a prior occasion, he had been
walking behind Harvey and Plaintiff down a hallway, when he
observed Plaintiff push Harvey, causing her to almost touch the
wall before catching her balance.  (Williams Dep. 37:3-13, 40:1-
6.)  Second, Williams reported that he had observed Harvey
standing in the receiving office and hitting Plaintiff on the

---

[6] Although Plaintiff denies that Kaminski's notes state "She's
extremely credible – attention to detail", the record belies his
position.  Kaminski's notes very clearly state this.  (Pl.'s Ex.
26.)

shoulder two or three times, while Plaintiff sat at his computer. (Williams Dep. 42-45.) Notably, Williams informed Rossino and Greiner that he did not see Plaintiff strike Harvey during this encounter. (Williams Dep. 45:1-6, 46:10-13; Greiner Dep. 106:23-107:6.) Williams also reported that he did not hear Harvey and Plaintiff argue or engage in any conversation prior to Harvey hitting Plaintiff. (Williams Dep. 43:15-22, 46:10-13.)

Greiner testified that during his investigation, he reviewed video surveillance tapes of the receiving dock area with Rossino. (DSMF ¶ 28; Greiner Dep. 99:16-20.) According to Greiner, he watched the surveillance tape for Friday, March 19, 2010, the day Harvey alleged the incident had occurred, but it did not show Plaintiff or Harvey in the area. (Greiner Dep. 99:21-100:15.) Believing Harvey may have been mistaken about the date of the incident, Greiner reviewed surveillance footage for other days, but did not observe any video footage where Plaintiff ever touched Harvey. (Greiner Dep. 100:21-101:7, 103:9-14.)

Defendant now points to a surveillance video for March 18, 2010 (Pl.'s Ex. P-71), and argues that it generally matches the description of the incident as set forth by Harvey and Williams. As an initial matter, the Court notes that Harvey and Williams' accounts differ as to certain material facts, such as whether

Plaintiff struck Harvey.  Further, a review of this video shows only that Harvey left the receiving dock office; spoke with Williams as she walked out of the video frame; shortly thereafter, re-entered the frame; walked towards the receiving dock office again, but turned around before entering the office; and then walked out of the frame again.  (Pl.'s Ex. P-71.)  The video did not show Harvey retrieving a radio, as she claimed she had done following the incident with Plaintiff.  Finally, the Court notes that Harvey herself testified that this video does not depict the date of the incident with Plaintiff.  (Harvey Dep. 156:22-158:19.)

As part of their investigation, Rossino and Greiner met with Plaintiff about the incident.  The parties dispute what was said during this meeting.  According to Plaintiff's sworn testimony, they initially asked him about a "rumor" that he was talking about two other co-workers "going away to Haiti together."  (Pl.'s Dep. 85:14-20, Pl.'s Ex. B.)  Plaintiff denied this, and they continued talking.  (Id. at 85:19-22.)  Then Greiner asked, "Did anything happen between you and [Harvey]?"  (Pl.'s Dep. 85:23-24.)  Although Plaintiff contends he did not know what they were talking about, he responded by describing an incident between him and Harvey that had occurred a few days earlier (Id. at 84:6-10):

> I told him that she poked me in the shoulder, and she
> rubbed me on my head; and I told her to stop playing
> around.  I reached out; and as soon as I said I
> reached out, they never let me say anything else.
> Nick Rossino said, "There it is," and that was it.
> And then Bob Greiner said, "Thank you for being
> candid," and . . . "We'll look into this, and we'll
> get back to you," and that was it.

(Pl.'s Dep. 86:24-87:12.)[7]

On March 25, Greiner had a second telephone conversation

with Kaminski (Greiner Dep. 83:10-11, Def.'s Ex. 18, Kaminski

Dep. 111:15-18, Def.'s Ex. 19), who took the following

handwritten notes:

> [Plaintiff] admits to slapping her.  Claims she
> slapped him in shoulder and poking finger in belly.
>
> George Williams – heard argument
> Saw her smack him on shoulder
> She confirmed, + then walked out.
>
> Smacked her on the butt after she poked him –
>
> George can confirm that her slap was last – because
> she came out immediately.
>
> [Rossino] told him not to engage in personal business
> with vendors.
>
> [H]ired 12/18/00

---

[7] By contrast, Greiner and Rossino aver that during this meeting,
Plaintiff admitted to striking Harvey's butt.  (Greiner Cert. ¶
6; Rossino Cert. ¶ 2.)  Greiner points to his notes to confirm
this, which read:
> Interviewed Lowe  "I smacked her
> On the Butt because she poked me."
(Def.'s Ex. 6 at p.3.)  Plaintiff denies saying this and claims
he did not see Greiner taking notes during this meeting.  (Pl.'s
Cert. ¶ 14, Pl.'s Ex. A.)  Given summary judgment posture, the
Court resolves this factual dispute, as it must, in Plaintiff's
favor and credits his sworn version of the facts.

```
Sup Security
5/26/52  - 58
Black – m
```

(Pl.'s Ex. P-26.)[8]  When asked why Plaintiff's race was mentioned

in her notes, Kaminski testified:

> Generally, when we're discussing disciplinary action
> of a serious nature, we review the facts of the case
> with our attorney.  And as part of that review the
> attorney does request that information, as they are,
> you know, ensuring that we're making decisions based
> on factors other than things such as race, sex,
> national origin.

(Kaminski Dep. 113:20-114:5.)  Kaminski admitted, however, that

in a separate investigation of a white employee (Rossino) for

sexual harassment, her notes did not include the individual's

race.  (Id. at 115:2-116:1).

After speaking with Greiner, Kaminski sent an email, dated

March 25, 2010, to Kelly Webber, Medco Health Solutions' Vice

President of Human Resources.  (Pl.'s Ex. 29.)  Kaminski

summarized the results of the investigation, including Harvey's

complaint and the fact that Plaintiff admitted to "slapping her

'on the butt'."  (Id.)  She recommended terminating Plaintiff's

employment.[9]  (Id.)  Towards the end of the email, Kaminski

---

[8] Plaintiff objects to the Court's consideration of these notes
on hearsay grounds but provides no support for this argument.
Notably, Plaintiff himself has proffered this evidence.
Nevertheless, Plaintiff's objection is denied for the reasons
discussed supra at n.4.  These notes are admissible to show
Kaminski's knowledge of the allegations against Plaintiff before
deciding to terminate him.
[9] Kaminski's email to Kelly Webber reads as follows:

stated:  "Coalet is a black male, 58 and employed with us since

12/18/00."  (<u>Id.</u>)  Webber responded via email, "I support the

term[ination]."  (<u>Id.</u>)[10]

---

> A One Source employee (cleaning vendor) made a
> complaint against [Plaintiff], Security
> Supervisor in WB.  She claims that that after an
> argument (in an office on the loading dock) he
> slapped her "on the butt" and then grabbed her
> wrists.  She pulled her hands away, slapped him
> on the shoulder and left the office immediately
> afterwards. Another employee heard the argument,
> saw her slap his shoulder through a window and
> then walk out.
>
> [Plaintiff] admits to slapping her "on the butt"
> but said it was after she slapped him on the
> shoulder and poked him in the stomach.  The HRM
> who conducted the interview with both confirmed
> her version based upon her credibility and the
> statement of the 3rd employee.
>
> The HRM [Greiner], HRD [Christine Bizarro] and
> Jack Shea [Medco's Employment Counsel] would like
> to move forward with termination. . . . I'm
> bringing [Michael Galvin, Senior Vice President
> of Infrastructure Services] and [Marene Allison,
> Vice President of Security] on-board and want to
> make sure you do not have any objections.
>
> <u>Coalet is a black male</u>, 58 and employed with us
> since 12/18/00. . . .
>
> Do you have any concerns with this decision?
>  (<u>Id.</u> (emphasis added).)

[10] Defendant also proffers an unsigned and undated memorandum
allegedly written by Greiner summarizing Plaintiff's
termination.  (Def.'s Ex. 10.)  Defendant describes it in his
certification as "a memorandum prepared by Robert Greiner
containing a summary of the investigation and outcome of
Harvey's complaint."  (Shaw Cert. ¶ 11, Dkt. Ent. 52-5.)
Plaintiff objects to its admission on hearsay grounds, noting
that it was drafted in November 2010, seven months <u>after</u>

On March 26, 2010, Plaintiff met with Greiner and Rossino, who advised him that his employment at Medco was terminated. (DSMF ¶ 44; Pl.'s Resp. ¶ 44.)  The parties agree that during this meeting, Plaintiff was told "you can't strike an employee or a vendor."  (DSMF ¶ 45; Pl.'s Res. ¶ 45, Pl.'s Dep. 90:19-20.)  The parties dispute the remainder of the conversation. According to Plaintiff, Greiner informed him that they had investigated "Alyssha Harvey's complaint," could not find anything, and determined that the matter was "inconclusive." (Am. Compl. ¶ 25.)  In his deposition testimony, Plaintiff elaborated:

> Well, [Rossino] said – he was looking sad, and he said, "You're a good employee, and I'm sorry." And Bob Greiner said that Medco procedures say – that's the first time I heard anything about anything, and he said – Bob Greiner said, "You're a supervisor.  We did an investigation.  The investigation was inconclusive, but you're a supervisor.  We hold you to a higher standard," and then he started saying stuff about you can't strike an employee or a vendor, and it's Medco's policy that we terminate – let you go, and it's best for you that we let you go; and they let me go.

(Pl.'s Dep. 90:11-22.)  Plaintiff contends that Greiner did not explain the exact nature of Harvey's complaint or allow him an opportunity to defend himself.  (Am. Compl. ¶ 25.)  He admits

---

Plaintiff's termination and after initiation of this lawsuit. Defendant has not opposed Plaintiff's hearsay objection or provided the Court with any reason to believe that it either is not hearsay or falls within an exception to the hearsay rule. Accordingly, the Court does not consider this document for purposes of this motion.

that he never asked Greiner to clarify the nature of Harvey's complaint, but notes by way of explanation, that he was very upset at the time.  (Pl.'s Dep. 91:15-92:1.)[11]

### B. Plaintiff's Corroboration of Cappuccio's Sexual Harassment Complaint Against Rossino

In October 2009, Patricia Cappuccio, a security officer employed by Medco's security company vendor, complained that she had been subjected to sexual harassment by Rossino and certain other men who worked at the Willingboro facility.  (DSUMF ¶ 51.) In connection with Medco's investigation of that complaint, Kaminski and Dominick Faustini, the Senior Director of Security for Medco Health Solutions, Inc., interviewed Plaintiff and others on November 12, 2009.  (DSUMF ¶ 52.)  Plaintiff corroborated Cappuccio's complaint of sexual harassment.  (DSUMF ¶ 54; Pl.'s Resp. ¶ 54.)  Specifically, Plaintiff reported to Kaminski and Faustini that Rossino participated in lewd jokes at Cappuccio's expense, that he made inappropriate comments relating to the appearance of women at work, such as "she's hot", that he used loud profanity that others could hear, that he allowed young, attractive women to store their purses and

---

[11] Defendant contends that after Plaintiff's termination, he had a phone conversation with Medco security supervisor, Janelle Auten, in which he admitted to hitting Harvey "on the rear". (DSUMF ¶ 49.)  In his deposition, Plaintiff denied making this statement.  (Pl.'s Dep. 147:5-13.)  For purposes of this motion, the Court credits Plaintiff's version of the facts.

14

coats in his office, that he touched his private parts in the presence of two female security officers, and that he would have women in his office with the door closed.  (DSUMF ¶¶ 54-55; Pl.'s Cert. ¶ 6, Pl.'s Ex. A; Pl.'s Dep. 113:5-12.)  Plaintiff also reported that Greiner would make "sly comments" such as that if an attractive woman wanted something, Rossino would help her.  (DSUMF ¶ 54.)  Plaintiff's fellow security supervisor, an African American woman named Janelle Auten, also reported similar incidents involving Rossino to Kaminski and Faustini. (DSUMF ¶¶ 58-59.)

At the conclusion of the investigation into Cappuccio's complaint, Medco required that Rossino be counseled to behave more professionally, refrain from participating in inappropriate jokes, and not permit them to occur.  (DSUMF ¶ 56.)

### C. Allegations that Rossino Struck an Employee

Plaintiff alleges that white employees also violated Medco's harassment policy but were not disciplined.  He cites to the investigation into Rossino as well as numerous others.  See, infra, n.14.  He also points to an incident in which Rossino allegedly "smacked" a female employee on the buttocks.  A former Medco employee, Tanyka Watson, testified that "Nicholas Rossino was actually allowed to smack Malika Lindsay on her butt, and he didn't get terminated."  (Watson Dep. 134:4-6.)  According to Watson, Lindsay reported to her the following:

15

> [Lindsay] said she was standing in the cafeteria along
> the long counter by the microwave and she was talking
> to somebody, or waiting for her food to get heated up,
> and that [Rossino] walked by, and then he walked by
> again and he smacked her on her ass.
> And I said, what, what do you mean?
> She was like, he smacked me on my ass.
> And I said, well, what did you do?
> She said, she didn't do anything.  She tried to
> pretend like it didn't happen, but she couldn't
> believe that he would f**ing touch her and smack her
> on her ass like that.

(Watson Dep. 134:4-135:7, Pl.'s Ex. O.)  Watson testified that
she discussed this incident with Brenda Johnson in Medco's human
resources ("HR") department.  (Watson Dep. 135:14-16.)  Watson
also testified that she did not know whether Lindsay had
reported the incident directly to HR.  (Id. at 135:25-136:2.)

Defendant cites to Sharon Flowers' account of the
Lindsay/Rossino incident.  Flowers, a former Medco employee,
testified that she observed Rossino "pat" Lindsay on her side,
as the two were standing in the cafeteria line, laughing and
talking.  (Flowers Tr. 13:25-14:14, Def.'s Ex. 34.)  Flowers
testified that "they were playing" and Lindsay "was laughing,"
so she did not believe the incident was "serious" in nature or
constituted sexual harassment.  (Id.)  Notably, however, she
testified that she did not report the incident to anyone at
Medco.  (Id. at 14:20-24.)  Thus, it appears Medco's HR
department only had notice of Lindsay's complaint via Watson's
report to Johnson.

16

Additionally, Harvey testified that prior to the March 2010 incident involving Plaintiff, she complained to Shonda Bittle about Rossino sexually harassing her.  (Harvey Dep. 142:3-16.)  According to Harvey, Bittle did not tell her to report her complaint about Rossino to Medco management, and there is no indication from the record that Bittle reported Harvey's complaint to anyone, although notably Bittle <u>did</u> report Harvey's complaint <u>about Plaintiff</u> to Rossino.

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[12]  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  <u>Id.</u> at 248.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should

---

[12] Pursuant to amendments to the Federal Rules of Civil Procedure in December 2010, the oft-cited summary judgment standard is now located in Rule 56(a) rather than 56(c).  Although the wording of the standard has changed slightly, replacing the word "issue" with "dispute", this change does not affect the substantive standard or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56(a) advisory committee's note.

be resolved against the moving party." Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the non-moving party . . . ."  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'"  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P.

56(e)).  The non-movant's burden is rigorous: it "must point to
concrete evidence in the record"; mere allegations, conclusions,
conjecture, and speculation will not defeat summary judgment.
Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir.
1995).

### III. ANALYSIS

Medco moves for summary judgment on all of Plaintiff's
claims as well as his request for punitive damages.  The
Court addresses each issue in turn.

### A. Plaintiff's Race Discrimination Claims

Plaintiff alleges claims for race discrimination in
violation of the LAD and 42 U.S.C. 1981(a).  New Jersey enacted
the LAD in furtherance of the state's public policy "to
eradicate invidious discrimination from the workplace." Carmona
v. Resorts Int'l Hotel, Inc., 915 A.2d 518, 528 (N.J. 2007)
(quoting Craig v. Suburban Cablevision, Inc., 660 A.2d 505 (N.J.
1995)).  The LAD makes it unlawful for an employer to discharge
an individual because of his race.  N.J. Stat. Ann. § 10:5-
12(a).  Similarly, Section 1981 provides a federal remedy
against race discrimination in private employment.  Johnson v.
Ry. Express Agency, Inc., 421 U.S. 454, 459-60 (1975); Gray v.
R.J. Reynolds Tobacco Co., Civ. No. 09-3788, 2011 WL 114868, *7
(D.N.J. Jan. 13, 2011).

Where, as here, the plaintiff has not alleged any direct evidence of discrimination, such claims are analyzed under the three-step, burden-shifting framework established in McDonnell Douglas v. Green, 411 U.S. 792 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). Chapman v. Am. Inst. Of Certified Public Accountants, 233 F. App'x 141, 143 (3d Cir. 2007) (applying McDonnell-Douglas analysis to § 1981 and LAD claims of race discrimination); Davis v. City of Newark, 285 F. App'x 899, 903 (3d Cir. 2008) (noting that LAD claims generally track the federal McDonnell Douglas framework).

At the first step of this analysis, Plaintiff must establish a prima facie case of discrimination.  To do so, he must prove (1) that he belongs to a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances that could give rise to an inference of intentional discrimination.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citations omitted); Davis, 285 F. App'x at 903; Campbell v. Sup. Ct. of N.J., Civ. No. 11-555, 2012 WL 1033308, *17 (D.N.J. Mar. 27, 2012).  If the plaintiff satisfies this burden, a presumption arises that the employer unlawfully discriminated against him.  St. Mary's Honor Ctr., 509 U.S. at

506.  The employer may rebut this presumption at the second stage of the analysis by articulating "some legitimate, nondiscriminatory reason for the employee's rejection."  Id. at 510 n.3 (citing Burdine, 450 U.S. at 252-53).  Although the burden of production shifts to the employer at this second step, the ultimate burden of persuasion remains at all times with the plaintiff.  Id. at 507.  If the employer satisfies its burden, the Court proceeds to the third step.  At this stage, the plaintiff carries "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination."  Burdine, 450 U.S. at 256.  He "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id. (citing McDonnell Douglas, 411 U.S. at 804-05); see also Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998).

## 1. **Prima Facie** Case

Medco argues that Plaintiff cannot establish a prima facie case because there is no evidence to support the fourth prong,

that he was terminated under circumstances giving rise to an inference of discrimination.[13]

Plaintiff counters with evidence that Medco decision-makers twice mentioned that he is "black" in their communications on whether to terminate him – first, in Kaminski's notes from her discussion with Greiner, and second, in Kaminski's email to Webber. Kaminski testified that she included this information at the request of Medco's attorney to ensure that Medco was not making termination decisions on improper bases such as race, national origin, or gender. However, she also admitted that in a separate investigation of a white employee for sexual harassment (Rossino), her notes did not include the individual's race. In its reply papers, Medco argues that Kaminski's notes concerning the Rossino investigation did not include his race because he had committed only a "minor policy violation," whereas Plaintiff was being considered for "significant disciplinary action." (Def.'s Reply 9.) Notably, however, Kaminski did not testify to this. She testified that she included Plaintiff's race because when "discussing [a] disciplinary action of a serious nature, we review the facts of the case with our attorney." (Kaminski Dep. 113:20-23.) She

---

[13] Defendant has apparently conceded that Plaintiff satisfied the first three prongs of his prima facie case. The Court therefore does not address them.

also testified that after investigating <u>one</u> aspect of the sexual harassment complaint against Rossino – that he had participated in a lewd joke – she <u>concluded</u> that he should receive counseling, explaining that Medco does not "necessarily issue disciplinary actions for minor violations of its sexual harassment policy." (Kaminski Dep. 70:23-71:8.)  She did not represent, however, that throughout her investigation of Rossino, she <u>never</u> considered the possibility of taking a "serious" disciplinary action against him.  She also never testified that this fact explained the omission of his race in her notes.  Given the parties' dispute over this issue and without competent evidence to support Medco's position, the Court may not draw such inferences in its favor.

Nevertheless, the context of Kaminski's notes and email – which listed Plaintiff's race along with other personnel data, such as the date he was hired, his age, birth date, and gender – supports her explanation that this information was collected for permissible HR purposes at the request of Medco's attorney.  The Court therefore disagrees with Plaintiff that this fact, standing alone, supports an inference that Medco impermissibly considered his race when deciding to terminate him.

Plaintiff points to an additional fact, however, which tips the scales in his favor.  Plaintiff proffered testimony showing that Medco chose not to terminate Rossino, a white security

23

manager, after learning of nearly identical allegations against him.[14]  He points to Watson's testimony that she advised Medco HR employee Brenda Johnson that Rossino had "smacked" a female employee named Malika Lindsay "on her butt".  (Watson Dep. 134:4-135:6; 58:17-19.)  Plaintiff may establish an inference of discrimination if he can show that Medco "treated more favorably similarly situated persons not within the protected class." Wilcher v. Postmaster General, 441 F. App'x 879, 881 (3d Cir. 2011), cert. den'd, 132 S.Ct. 1645 (2012) (quoting Simpson, 142 F.3d at 645); Greenawalt v. Clarion Cnty., -- F. App'x --, 2012 WL 256045, *2 (3d Cir. Jan. 30, 2012).  The comparator employees must be similarly situated in "all relevant respects." Wilcher, 441 F. App'x at 881-82.  Important factors include the degree of

---

[14] Plaintiff also cites to numerous other instances in which white employees were not terminated after allegedly violating Medco's sexual harassment policy – i.e., by making lewd or inappropriate comments or engaging in consensual relationships with subordinates.  Since these employees were accused of less serious infractions than the allegation against Plaintiff of physically striking another person, they are not similarly situated, and the Court does not consider them.  See Wilcher v. Postmaster Gen., 441 F. App'x 879, 881-82 (3d Cir. 2011), cert. den'd, 132 S.Ct. 1645 (2012) (court may consider whether employer treated more favorably persons not within protected class, only if they were "similarly situated" to plaintiff in terms of job responsibilities and "nature of the misconduct engaged in"); Rene v. Lidestri Foods, Inc., Civ. No. 09-3908, 2010 WL 4807050, *7 (D.N.J. Nov. 17, 2010) ("To be deemed similarly situated, the plaintiff must show that the other employee's acts were of comparable seriousness to his own infraction.").

similarity in the employees' "job responsibilities, the
supervisors and decision-makers, and the nature of the
misconduct engaged in." Id. at 882 (internal citations
omitted).  The analysis focuses on whether the employees
"engaged in similar conduct without such differentiating or
mitigating circumstances as would distinguish their conduct or
the employer's treatment of them." McCullers v. Napolitano, 427
F. App'x 190, 195 (3d Cir. 2011) (quoting Radue v. Kimberly-
Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)) (internal
quotations omitted).

     Plaintiff and Rossino both held supervisory roles in the
security department.  Both men were subject to Medco's sexual
harassment policy, and both were accused of virtually identical
misconduct – striking a female coworker on the buttocks.

     Citing Wilcher, 441 F. App'x at 882, Medco argues that
Rossino does not provide a proper comparison, because he held
the superior position of security manager (rather than
Plaintiff's position of security supervisor).  In Wilcher, the
Third Circuit held that an employee who was disciplined for the
same misconduct as the plaintiff was nonetheless not comparable
to the plaintiff because she held a superior position to him
"and thus it was at the discretion of a different supervisor not
to terminate her."  441 F. App'x at 882 (emphasis added).  This
language suggests that a comparator's superior title has

25

relevance insofar as it bears on whether another supervisor made the termination decision.  The Wilcher court relied on a Fifth Circuit decision that supports this interpretation, Lee v. Kansas City Southern Railway Company, 574 F.3d 253, 262 (5th Cir. 2009).  In Lee, the court found that the plaintiff was similarly situated to another employee despite having different supervisors because the ultimate decision-maker was the same person.  Id. at 260-61.  The facts are analogous here.  While the record is unclear as to whether Medco investigated Rossino for striking Lindsay, it appears that if such an investigation did take place, the ultimate corporate decision-makers would have been the same as those who decided Plaintiff's case. Kaminski and her superiors at Medco ultimately decided to terminate Plaintiff, and the record suggests that after investigating Rossino on unrelated charges of sexual harassment, she played a similar role in deciding not to terminate him. (Kaminski Dep. 70:22-71:8.)

Furthermore, the fact that Rossino was Plaintiff's superior has little bearing in this instance, where the record shows that the only factors considered by the decision-makers in terminating Plaintiff were his status as a supervisor and Harvey's allegations, two things which did not differentiate him from Rossino, who held a supervisory role as security manager and was accused of the same misconduct.  Simpson, 142 F.3d at

26

647 ("In determining whether similarly situated nonmembers of a
protected class were treated more favorably than a member of the
protected class, the focus is on the particular criteria or
qualifications identified by the employer as the reason for the
adverse action.") (citing Ezold v. Wolf, Block, Schorr & Solis-
Cohen, 983 F.2d 509, 528 (3d Cir. 1992), cert. den'd, 510 U.S.
826 (1993)); Patterson v. Avery Dennison Corp., 281 F.3d 676,
680 (7th Cir. 2002) ("It is also relevant whether the employees
had comparable 'experience, education and qualifications,'
provided that the employer took these factors into account when
making the personnel decision in question.") (emphasis added)
(quoting Radue, 219 F.3d at 617).  Thus, considerations such as
Plaintiff's job responsibilities, qualifications, and
experience, did not enter into the equation.

Medco next argues that Watson's statement is hearsay and
may not be considered.  (Reply Br. 4-5.)  The Court rejects this
argument, since both statements – Lindsay's statement to Watson
and Watson's statement to Medco HR personnel – are proffered not
to prove the truth of Lindsay's allegations but to prove
Watson's and Medco's knowledge of her complaint against Rossino.
See, supra, n.4.

Finally, Medco attempts to undermine the significance of
Watson's statement by arguing that Watson did not technically
"report" the incident to Medco's HR department since she

27

conveyed it during a "casual conversation". (Reply Br. 4-5.)
The Court disagrees with this characterization and declines to
take such a dismissive view of Watson's testimony.  While Watson
did not use the term "report", she testified that she "talked to
[Johnson] about it" during a "discussion [when they] were
talking about things." (Johnson Dep. 135:21-24, Pl.'s Ex. O.)
Watson never referred to this as a "casual conversation".
Medco's human resources department was therefore on notice that
its security manager had allegedly struck another employee.  The
Court notes that Medco's investigation into Plaintiff's conduct
was promulgated not by the formal filing of a complaint by
Harvey but by the same type of informal notice to Medco's human
resources department.  Harvey related her story to Bittle, who
reported it to Rossino, who reported it to Greiner in human
resources, who initiated an investigation.  With respect to the
allegations against Rossino, Lindsay reported her story to
Watson, who reported it to Johnson in human resources.  While it
is unclear from the record, it appears that unlike the
allegations against Plaintiff, Medco apparently took no action
to investigate this complaint against Rossino or to terminate
him.

     Plaintiff also points to evidence that calls into question
whether Medco made a good faith assessment of Harvey's complaint
before deciding to terminate him.  Medco fired him after an

investigation that, according to Plaintiff's sworn testimony,
even Medco HR official Greiner admitted was "inconclusive".
(Pl.'s Dep. 90:11-22.)  Although Greiner purportedly found
Harvey credible, the story she allegedly relayed to him and her
written account of the incident are inconsistent; in the latter,
she omitted the fact that she hit Plaintiff twice during the
incident.  The sole witness, George Williams, also contradicted
her allegations.  He reported to Greiner and Rossino during
their investigation that he did <u>not</u> observe Plaintiff strike
Harvey, although he had seen Harvey hit Plaintiff.  Harvey's
credibility was further undermined by the fact that video
surveillance footage on the date Harvey insisted the incident
had occurred did not show her or Plaintiff in the area, and
video footage from the next day – which Harvey insisted did not
depict the date in question - merely showed Harvey walking out
of the security office.  Plaintiff also testified that during
his interview with Rossino and Greiner, he was not permitted an
opportunity to explain his account of the incident.  Although
Medco has proffered evidence that Plaintiff admitted to striking
Harvey during this interview, Plaintiff has vehemently denied
this fact, and the Court must credit his sworn testimony.

The Court notes that the burden of establishing a <u>prima
facie</u> case is not onerous.  <u>Texas Dept. of Cmty. Affairs v.
Burdine</u>, 450 U.S. 248, 253 (1981).  This first stage serves

merely to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's" termination. <u>Id.</u> at 254.  In light of all the evidence, the Court finds that Plaintiff has satisfied his burden of showing that his termination occurred under circumstances that give rise to an inference of intentional discrimination.  He therefore has met the minimal burden of establishing a <u>prima facie</u> case, and a presumption now arises that Medco unlawfully discriminated against him.  <u>St. Mary's Honor Cntr. v. Hicks</u>, 509 U.S. 502, 506 (1993).

### 2. Legitimate, Nondiscriminatory Reason for Termination

To rebut this presumption of discrimination, Medco must produce admissible evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason.  <u>St. Mary's Honor</u>, 509 U.S. at 506 (internal citation omitted).

Medco contends that Plaintiff was terminated because its investigation revealed that he had violated the company's sexual harassment policy.  Courts have recognized this as a legitimate and nondiscriminatory reason for termination.  <u>Byrd v. Lynch</u>, Civ. No. 10-247, 2011 WL 2680572, *5 (D.N.J. July 8, 2011) (citing <u>Moussa v. Pa. Dep't of Pub. Welfare</u>, 413 F. App'x 484, 486 (3d Cir. 2011) (affirming district court's holding that defendants had articulated legitimate, nondiscriminatory reason for plaintiff's termination, his repeated sexual harassment of his co-workers)).

Medco must therefore produce admissible evidence, which would allow a trier of fact to conclude that the employment decision was not motivated by discriminatory animus.  Burdine, 450 U.S. at 257.  Medco points to the following facts to support its termination decision.  It maintained a sexual harassment policy, with which Plaintiff was familiar.  (Def.'s Ex. 3.)  Plaintiff was accused of violating that policy, and Medco investigated those allegations.  After interviewing the complainant, the relevant witnesses, and Plaintiff, and reviewing video surveillance tapes, Medco concluded that it had grounds to terminate Plaintiff.  It notified him of his termination shortly thereafter.  Given the evidence documenting Harvey's complaint and Medco's investigation into that complaint, the Court finds that Defendant has satisfied its burden of production at this stage.

### 3. Pretext

Once an employer has articulated legitimate, nondiscriminatory grounds for the termination, the presumption of discrimination disappears, and the plaintiff carries the ultimate burden of proving that these reasons were "a pretext for discrimination."  Burdine, 450 U.S. at 256.  While a plaintiff must ultimately prove by a preponderance of the evidence that the employer intentionally discriminated against him, to withstand summary judgment, he need only raise a genuine

31

issue of fact as to whether the employer terminated him for its proffered reason.  Wilcher, 441 F. App'x at 881.  When assessing pretext, the trier of fact may consider the evidence and inferences supporting the prima facie case.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (citing Burdine, 450 U.S. at 255, n.10).  In fact, the plaintiff may survive summary judgment without citing additional evidence of discrimination beyond his prima facie case, if he has produced sufficient evidence to discredit the employer's proffered reasons for the adverse action.  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  The plaintiff need only "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764 (internal citations omitted, emphasis added).

To satisfy the first Fuentes prong, Plaintiff "need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons."  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998) (internal citations omitted).  Rather, he need only "point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reason did not actually motivate the employer's action." Id. at 644 (internal quotations and citations omitted).

To satisfy the second Fuentes prong, the plaintiff need not prove that the illegitimate factor was "the sole reason" for the employment decision, but rather, that it was "a determinative factor"; that is, but for the protected characteristic, the plaintiff would not have been fired. Fuentes, 32 F.3d at 764. Plaintiff may do this by showing that (1) the employer has previously discriminated against him, (2) that the employer has discriminated against other persons within his protected class or within another protected class, or (3) that the employer has treated more favorably similarly situated persons not within the protected class. Simpson, 142 F.3d at 644 (citing Fuentes, 32 F.3d at 765).

Crediting Plaintiff's sworn testimony and viewing all facts and inferences in his favor, he has established: (1) that Medco human resources officials mentioned his race during their investigation and in their discussions on whether to terminate him but did not mention a white employee's race when investigating a prior sexual harassment claim, (2) that a similarly situated white employee, who was alleged to have

33

struck a female employee on the buttocks was not terminated, and (3) that Plaintiff was terminated after an investigation in which HR personnel did not permit him to explain his account of the incident and instead relied only upon Harvey's unsupported allegations, which were contradicted by the only eye witness to the incident as well as video surveillance footage.

The Court must view these facts collectively. As the Third Circuit has repeatedly held, "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Abramson v. William Paterson Coll., 260 F.3d 265, 276 (3d Cir. 2001) (citation omitted). Considering the totality of these facts, and viewing them and all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has proffered just enough evidence to survive summary judgment. While it is a close question, he has cast sufficient doubt on Medco's proffered reason for his termination, given the circumstances surrounding the investigation, the inclusion of his race in discussions regarding his termination, and the disparate treatment of a similarly situated, white employee. For the same reasons, the Court also finds a genuine factual dispute as to whether Plaintiff's race played a determinative role in his termination.

34

Medco's motion for summary judgment on this claim is therefore
denied.

## B. Plaintiff's Retaliation Claim

In Count III of the Amended Complaint, Plaintiff asserts a
retaliation claim under the LAD on the grounds that Medco
terminated him because he corroborated complaints of sexual
harassment against Rossino.  (Am. Compl. ¶ 34.)[15]  Medco moved
for summary judgment on this claim.  First, Medco argues that
Plaintiff cannot establish a prima facie case, because there is
no evidence that his assistance in the Rossino investigation
caused his termination.  Second, Medco argues that Plaintiff
cannot show that its nondiscriminatory reason for firing
Plaintiff is a pretext.

The Court notes that while the Amended Complaint fails to
allege any facts in support of the retaliation claim (an issue
Medco has not raised), Plaintiff has identified certain relevant
facts in his opposition papers.  These pertain to instances in
which Rossino (who is not a defendant in this action) allegedly

---

[15] In Plaintiff's opposition papers, he proceeds as though he has
asserted a claim of retaliation not only for his termination but
also for receiving a written warning in February 2010.  (Pl.'s
Opp. Br. 26 ("Plaintiff's retaliation claims as noted in the
Amended Complaint are for these two adverse actions.").)  The
Amended Complaint, however, makes no reference to this purported
additional retaliation claim.  Accordingly, the Court does not
consider it.  To the extent Plaintiff wishes to file a second
amended complaint, he must do so in compliance with the Federal
Rules of Civil Procedure.

retaliated against him by "displaying animosity" towards him, significantly increasing his assignments, giving him assignments that should have gone to other security officers, and using false allegations to subject him to a disciplinary action in February 2010. (Pl.'s Opp. Br. 28.) Notably, Plaintiff has not proffered any evidence connecting Rossino's retaliatory conduct with Medco's decision to terminate him. Nor has he identified a theory by which Medco is liable for Rossino's purported misconduct. While the record shows that Rossino took some part in the investigation into Harvey's allegations and was part of "executing" the termination, (Greiner Dep. 119:6-15), Plaintiff has not cited any evidence that Rossino influenced the termination decision itself. In Kaminski's email to Webber on March 25, 2010, she recommended Plaintiff's termination, noting only that Greiner, Bizarro, and Shea - not Rossino - "would like to move forward with termination." (See, supra, n.10; Pl.'s Ex. 29.)

Although the parties have not addressed this issue, it appears they are operating under the assumption that Medco may be liable for Rossino's retaliatory conduct under the "cat's paw" theory recently adopted by the Supreme Court. Staub v. Proctor Hospital, -- U.S. --, 131 S.Ct. 1186, 1189 (2011).[16]

---

[16] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United

Under this theory, "an employer may be held liable for
employment discrimination based on the discriminatory animus of
an employee who influenced, but did not make, the ultimate
employment decision." Id.  In Staub, the Supreme Court examined
allegations of employment discrimination in the context of the
Uniformed Services Employment and Reemployment Rights Act of
1994, 38 U.S.C. § 4301 et seq. ("USERRA"), which deals with
discriminatory actions taken against a person who is a member of
the military.  Id.  The plaintiff proffered evidence that his
immediate supervisor and his supervisor's supervisor were
hostile to his military obligations and fabricated allegations
against him, causing the vice president of human resources to
fire him.  Id.  Staub sued the hospital under USERRA contending
that the ultimate decisionmaker was influenced by his
supervisors' hostility to his military obligations.  The Supreme
Court agreed, holding that "if a supervisor performs an act
motivated by antimilitary animus that is intended by the
supervisor to cause an adverse employment action, and if that
act is a proximate cause of the ultimate employment action, then

_____

States employment discrimination law by [Judge Richard] Posner
in 1990. In the fable, a monkey induces a cat by flattery to
extract roasting chestnuts from the fire. After the cat has done
so, burning its paws in the process, the monkey makes off with
the chestnuts and leaves the cat with nothing." Id. at 1190 n.1
(citation omitted).  The term refers to cases where a plaintiff
seeks "to hold his employer liable for the animus of a
supervisor who was not charged with making the ultimate
employment decision." Id. at 1190 (citation omitted).

the employer is liable under USERRA."  Id. at 1194 (emphasis in original).  The Staub Court defined "proximate cause" as "some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect."  Id. at 1192 (internal citations and quotations omitted).

Although Staub arose in the context of a USERRA claim, it has been applied to Title VII actions, which the Supreme Court noted are "very similar".  Id. at 1191; McKenna v. City of Phila., 649 F.3d 171 (3d Cir. 2011), cert. den'd, -- U.S. --, 2012 WL 463678 (Apr. 16, 2012) (applying Staub to Title VII retaliation claim).  While the New Jersey Supreme Court has not ruled on Staub's application to LAD claims, such claims have generally "paralleled" the Title VII analysis.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1087-88 (3d Cir. 1996); Grigoletti v. Ortho Pharma. Corp., 570 A.2d 903, 909 (N.J. 1990) ("In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII . . . .").  Moreover, before Staub was decided, another New Jersey appellate court adopted a "lenient" version of the cat's paw theory in the context of a wrongful termination claim under the LAD.  Kwiatkowski v. Merrill Lynch, 2008 WL 3875417, *9 (N.J. App. Div. Aug. 13, 2008), cert. den'd,

38

962 A.2d 530 (N.J. 2008) (noting that the Third Circuit

"endorsed such a lenient approach" and "predicted that the New

Jersey Supreme Court would 'hold an employer liable for the

discriminatory conduct of its supervisors irrespective of the

knowledge of intent of the ultimate decision-makers'") (quoting

Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 n.11 (3d Cir.

1996)).  While that court did not use the "proximate cause"

language of Staub, it held that a wrongful termination claim

could survive where a supervisor's discriminatory animus

"influenced or participated" in the adverse employment decision.

Id. at *11.[17]  Another New Jersey appellate court applied Staub

in the analogous civil rights context of a retaliation claim

under New Jersey's Conscientious Employee Protection Act

---

[17] The Kwiatkowski Court noted:
> New Jersey courts have not directly addressed the
> subordinate bias theory or the "cat's-paw" doctrine in any
> reported case. However, as previously stated, our Supreme
> Court, in the context of distinguishing between a direct
> evidence case and a pretext case, has recognized that a
> court should consider whether "a statement made by a
> decisionmaker associated with the decisionmaking process
> actually bore on the employment decision at issue."
> McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 528
> (2003). Also, in Grasso v. West New York Board of
> Education, 364 N.J.Super. 109 (App. Div. 2003), cert.
> den'd, 179 N.J. 312 (2004), we cited with approval the
> Third Circuit's formulation that "'it is sufficient if
> those exhibiting discriminatory animus influenced or
> participated in the decision.'" Id. at 118 (quoting
> Abramson v. William Paterson Coll. of N.J., 260 F.3d 265,
> 286 (3d Cir. 2001)). These authorities seem to suggest that
> our courts tend toward a more lenient approach regarding
> this issue.

Id. at *11.

("CEPA"). <u>Battaglia v. United Parcel Serv., Inc.</u>, 2011 WL
3516925, *10 (N.J. App. Div. Aug. 12, 2011), <u>cert. granted</u>, 36
A.3d 1064 (2012); <u>see also</u> <u>Potena v. State, Bd. of Pub.
Utilities</u>, 2011 WL 2713438 (N.J. App. Div. July 14, 2011), <u>cert.
den'd</u>, 36 A.3d 1064 (2012) ("Because CEPA is a civil rights
statute, like the [LAD] and [Title VII], we employ the same
analytical approach in CEPA cases as we employ in LAD and Title
VII cases."). Thus, it appears likely that the New Jersey
Supreme Court will adopt a standard similar to the "cat's paw"
theory enunciated in <u>Staub</u>.

Although the parties appear to proceed under a "cat's paw"
theory, neither party has proffered facts or argument on this
issue. The Court therefore reserves on Medco's motion for
summary judgment and permits Plaintiff an opportunity to clarify
the theory upon which it attempts to hold Medco liable. In the
event Plaintiff chooses to pursue this claim and clarifies its
theory of liability, the parties shall file supplemental
briefing identifying the relevant facts as well as the propriety
of such liability.

**C. Plaintiff's Request for Punitive Damages**

Medco also seeks dismissal of Plaintiff's request for
punitive damages. The Court has not yet resolved whether
Plaintiff's retaliation claim under the LAD withstands summary
judgment. Since the Court has directed supplemental briefing on

this claim, the Court cannot properly engage in the fact-intensive inquiry necessary to determine punitive damages at this juncture.  Accordingly, the Court reserves on Medco's motion to dismiss Plaintiff's request for punitive.

### IV. CONCLUSION

For the foregoing reasons, the Court denies in part and reserves in part on Medco's motion for summary judgment.  An appropriate Order will issue herewith.


Date:  <u>April 27, 2012</u>                    <u>s/Renée Marie Bumb</u>
                                         RENEE MARIE BUMB
                                         United States District Judge