<u>NOT FOR PUBLICATION</u>                                    [Dkt. Ent. 52]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

| | |
|---|---|
| Coalet Lowe,<br><br>               Plaintiff,<br>     v.<br><br><br>Medco Health Solutions of<br>Willingboro, LLC.,<br><br>               Defendant. | Civil No. 10-4823<br>(RMB/AMD)<br><br><br>**OPINION** |

Olugbenga O. Abiona, Esq.
1433 South 4th Street
Philadelphia, PA 19147
     Attorney for Plaintiff

John James Peirano, Jr., Esq.
Vimal Kumar Shah, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962-2075
     Attorneys for Defendant

**BUMB**, United States District Judge:

     Plaintiff Coalet Lowe alleges that his former employer,

defendant Medco Health Solutions of Willingboro, LLC ("Medco"),

terminated him due to his race in violation of 42 U.S.C. § 1981

(Count I) and the New Jersey Law Against Discrimination ("LAD")

(Count II).  Plaintiff also asserts a retaliation claim under the LAD on the grounds that Medco terminated him for corroborating a sexual harassment complaint against one of his superiors (Count III).  Medco moved for summary judgment as to all three claims as well as Plaintiff's request for punitive damages.  This Court denied summary judgment on Count I and Count II and reserved with respect to Count III and the availability of punitive damages. After supplemental briefings by the parties, for the following reasons, summary judgment on Count III and Plaintiff's punitive damages claims is DENIED.

## I. BACKGROUND[1]

Medco is a subsidiary of Express Scripts Holding Company, a company that manages pharmacy benefits and provides pharmaceuticals by mail order.  Plaintiff, an African American man, worked as a security supervisor at Medco's facility in Willingboro, New Jersey, from 2000 until his termination on March 26, 2010.

At the time of Plaintiff's termination in March, 2010, Alyssha Harvey, an employee of a vendor company that provided cleaning services for Medco, complained to security officer Shonda Bittle that a couple of days earlier, Plaintiff had

---

[1] A detailed recitation of the underlying facts related to all counts before the Court has been set forth in the Court's Opinion dated April 27, 2012 and are incorporated by reference herein. The Court provides a succinct review of the facts for discussion only of Count III of the Plaintiff's complaint and his request for punitive damages.

"smacked" her on her "butt" and grabbed her wrists. (Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 13.) Bittle then reported the vendor employee's complaint to Medco's security manager, Nicholas Rossino.[2] (DSUMF ¶ 14 (citing Rossino Dep. Tr. 217:4-10, Def.'s Ex. 20); Bittle Dep. Tr. 61:7-20, Pl.'s Ex. P.) Rossino, in his sworn testimony, stated that he heard of an incident between Plaintiff and Harvey from Bittle and instructed her that Harvey would have to make an official complaint. (Pl.'s Ex. I, Rossino Tr. 217:11-218:6). However, Rossini initiated the investigation into Harvey's allegation by calling Medco's human resources business partner, Robert Greiner before Harvey made an official complaint against Plaintiff. Id.

Previously, in October 2009, Plaintiff had served as a corroborating witness for co-worker Patricia Cappuccio's, complaint of sexual harassment against Rossino. (DSUMF ¶ 54; Pl.'s Resp. ¶ 54.) Specifically, Plaintiff reported to Robin Kaminski, the human resources manager for Medco health Solutions, Inc. and Dominick Faustini, Senior Director of Security for Medco Health Solutions, Inc. that Rossino participated in lewd jokes at Cappuccio's expense, that he made inappropriate comments relating to the appearance of women at work, such as "she's hot", that he used loud profanity that others could hear, that he allowed

---

[2] Although Plaintiff disputes this fact, he has proffered no facts or evidence to the contrary, and the Court cannot credit his baseless assertions. Bittle expressly testified that she reported Harvey's complaint about Plaintiff hitting her to Rossino. (Bittle Tr. 61:7-20.)

young, attractive women to store their purses and coats in his office, that he touched his private parts in the presence of two female security officers, and that he would have women in his office with the door closed. Plaintiff also reported that Greiner would make "sly comments" such as that if an attractive woman wanted something, Rossino would help her. (DSUMF ¶ 54-55.)

Both Rossino and Greiner were aware of the statements made by Plaintiff during the course of the investigation into the sexual harassment allegations against Rossino. Medco's investigation into the allegations against Rossino took several weeks and Rossino was ultimately cautioned about his behavior and required to attend an appropriate training. (DSUMF ¶56, Pl.'s CCSDF ¶ 167.)

In the months between Medco's investigation of Rossino and Plaintiff's "smacking" of Harvey, Plaintiff alleges that Rossino took retaliatory actions against him for corroborating his co-worker's claims.[3] These actions included increasing Plaintiff's workload and assigning him duties that belonged to other Security Officers. (Pl.'s CCSDF ¶151.) Additionally, Rossino issued Plaintiff a disciplinary action based on, what Plaintiff alleges to be, false accusations, claiming that Plaintiff failed to perform an assignment in a timely manner. (CSDF ¶ 151; Pl. Ex. P-

---

[3] Defendant disputes this allegation in its entirety and alleges that some of the actions Plaintiff points to actually took place prior to the Rossino sexual harassment investigation.

52). Plaintiff further alleges that he had never received any disciplinary action from Rossino prior to his corroboration of the sexual harassment complaint. Id.

Returning to the March, 2010 events and the investigation into Plaintiff, Rossino reported Harvey's complaint to Greiner. (DSUMF ¶ 15.) On March 24, 2010, Greiner, with Rossino's assistance, commenced an investigation into Harvey's complaint. (Pl.'s Ex. I, Rossino Tr. 217:11-218:6) Rossino then remained involved in the investigation alongside Greiner. (Pl. Ex. F).

In a phone conversation on March 24, 2010, Greiner reported what he had learned from Harvey to Kaminski. (DSMF ¶ 23.) Kaminski was aware of Rossino's partnership in the investigation alongside Greiner. (Pl. Ex. F). Finally, Kaminski was cognizant that Plaintiff had previously corroborated complaints from female Medco employments that Rossino engaged in harassing and inappropriate workplace behavior. Plaintiff alleges that Kaminski acknowledged in her sworn testimony that it was inappropriate for Rossino to be involved in the investigation into Harvey's complaint in any way given his prior history with the Plaintiff.[4] (CCSDF ¶¶176, 180-181.)

As the investigation continued, Rossino and Greiner met with Plaintiff about the incident.  The parties dispute what was said

---

[4] Defendant alleges that Kaminski classified Rossino's involvement in the investigation as inappropriate because he had pursued a romantic relationship with Harvey unsuccessfully, rather than because she was on notice of Rossino's animus toward Plaintiff. (CCSDF ¶181.)

during this meeting.  According to Plaintiff's sworn testimony,
they initially asked him about a "rumor" that he was talking
about two other co-workers "going away to Haiti together."
(Pl.'s Dep. 85:14-20, Pl.'s Ex. B.)  Plaintiff denied this, and
they continued talking.  (Id. at 85:19-22.)  Then Greiner asked,
"Did anything happen between you and [Harvey]?"  (Pl.'s Dep.
85:23-24.)  Although Plaintiff contends he did not know what they
were talking about, he responded by describing an incident
between him and Harvey that had occurred a few days earlier (Id.
at 84:6-10):

> I told him that she poked me in the shoulder, and she
> rubbed me on my head; and I told her to stop playing
> around.  I reached out; and as soon as I said I reached
> out, they never let me say anything else.  Nick Rossino
> said, "There it is," and that was it.  And then Bob
> Greiner said, "Thank you for being candid," and . . .
> "We'll look into this, and we'll get back to you," and
> that was it.

(Pl.'s Dep. 86:24-87:12.)[5]

On March 25, Greiner had a second telephone conversation
with Kaminski (Greiner Dep. 83:10-11, Def.'s Ex. 18, Kaminski
Dep. 111:15-18, Def.'s Ex. 19). Following is a relevant portion
of Kaminski's handwritten notes:

---

[5] By contrast, Greiner and Rossino aver that during this meeting, Plaintiff
admitted to striking Harvey's butt.  (Greiner Cert. ¶ 6; Rossino Cert. ¶ 2.)
Greiner points to his notes to confirm this, which read:
        Interviewed Lowe  "I smacked her
        On the Butt because she poked me."
(Def.'s Ex. 6 at p.3.)  Plaintiff denies saying this and claims he did not see
Greiner taking notes during this meeting.  (Pl.'s Cert. ¶ 14, Pl.'s Ex. A.)
Given summary judgment posture, the Court resolves this factual dispute, as it
must, in Plaintiff's favor and credits his sworn version of the facts.

> [Plaintiff] admits to slapping her. Claims she slapped him in shoulder and poking finger in belly….

After speaking with Greiner, Kaminski sent an email, dated March 25, 2010, to Kelly Webber, Medco Health Solutions' Vice President of Human Resources. (Pl.'s Ex. 29.) Kaminski summarized the results of the investigation, including Harvey's complaint and the fact that Plaintiff admitted to "slapping her 'on the butt'." (<u>Id.</u>) She recommended terminating Plaintiff's employment. (<u>Id.</u>)

On March 25, 2010, Rossino instant messaged with Kaminski regarding the status of the investigation of Plaintiff. Kaminski indicated that "we're still communicating with our side. So if we don't wrap this up before Coalet leaves, we can just ask him not to return tomorrow." Rossini messaged to Kaminski that he was "fine with that." Further, Kaminski asked Rossini "are you good with the decision to term?" Rossini's response was "yes, I agree." (Pl. Ex. P-27).

On March 26, 2010, Plaintiff met with Greiner and Rossino, who advised him that his employment at Medco was terminated. (DSMF ¶ 44; Pl.'s Resp. ¶ 44.) No more than three days had passed from the time Rossino initiated the investigation to Plaintiff's termination.

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id. at 248.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the non-moving party . . . ." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment motions thus require judges to 'assess how one-sided evidence is,

---

[6] Pursuant to amendments to the Federal Rules of Civil Procedure in December 2010, the oft-cited summary judgment standard is now located in Rule 56(a) rather than 56(c). Although the wording of the standard has changed slightly, replacing the word "issue" with "dispute", this change does not affect the substantive standard or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56(a) advisory committee's note.

or what a 'fair-mind ed' jury could 'reasonably' decide.'"
Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d
Cir. 1989) (quoting Anderson, 477 U.S. at 265).

    The movant "always bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact." Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P.
56(c)). Then, "when a properly supported motion for summary
judgment [has been] made, the adverse party 'must set forth
specific facts showing that there is a genuine issue for trial.'"
Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The
non-movant's burden is rigorous: it "must point to concrete
evidence in the record"; mere allegations, conclusions,
conjecture, and speculation will not defeat summary judgment.
Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir.
1995).

### III. ANALYSIS

### A. Count III Retaliation

    In Count III of the Amended Complaint, Plaintiff
asserts a retaliation claim under the LAD on the grounds
that Medco terminated him because he corroborated complaints

of sexual harassment against Rossino.  (Am. Compl. ¶ 34.)
Medco moves for summary judgment on this claim.

In its previous opinion, this Court noted that
Plaintiff seemingly asserted his retaliation claim under
Staub v. Proctor Hospital's  "cat's paw" theory of
liability, though neither party addressed this controlling
framework in their briefs.  Staub v. Proctor Hospital, --
U.S. --, 131 S.Ct. 1186, 1189 (2011). Following supplemental
briefings by the parties specifically on cat's paw
liability, the Court now denies summary judgment on Count
III for the following reasons.

Under Staub, "an employer may be held liable for employment
discrimination based on the discriminatory animus of an employee
who influenced, but did not make, the ultimate employment
decision."  Id.  In Staub, the Supreme Court examined allegations
of employment discrimination in the context of the Uniformed
Services Employment and Reemployment Rights Act of 1994, 38
U.S.C. § 4301 et seq. ("USERRA"), which deals with discriminatory
actions taken against a person who is a member of the military.
Id.  The plaintiff proffered evidence that his immediate
supervisor and his supervisor's supervisor were hostile to his
military obligations and fabricated allegations against him,
causing the vice president of human resources to fire him.  Id.
Staub sued the hospital under USERRA contending that the ultimate

10

decision maker was influenced by his supervisors' hostility to
his military obligations.  The Supreme Court agreed, holding that
"if a supervisor performs an act motivated by antimilitary animus
that is <u>intended</u> by the supervisor to cause an adverse employment
action, and if that act is a proximate cause of the ultimate
employment action, then the employer is liable under USERRA."
<u>Id.</u> at 1194 (emphasis in original).  The <u>Staub</u> Court defined
"proximate cause" as "some direct relation between the injury
asserted and the injurious conduct alleged, and excludes only
those links that are too remote, purely contingent, or indirect."
<u>Id.</u> at 1192 (internal citations and quotations omitted).

    Although <u>Staub</u> arose in the context of a USERRA claim, it
has been applied to Title VII actions, which the Supreme Court
noted are "very similar".  <u>Id.</u> at 1191; <u>McKenna v. City of
Phila.</u>, 649 F.3d 171 (3d Cir. 2011), <u>cert. den'd</u>, -- U.S. --,
2012 WL 463678 (Apr. 16, 2012) (applying <u>Staub</u> to Title VII
retaliation claim).  While the New Jersey Supreme Court has not
ruled on <u>Staub</u>'s application to LAD claims, such claims have
generally "paralleled" the Title VII analysis.  <u>Aman v. Cort
Furniture Rental Corp.</u>, 85 F.3d 1074, 1087-88 (3d Cir. 1996);
<u>Grigolettei v. Ortho Pharma. Corp.</u>, 570 A.2d 903, 909 (N.J. 1990)
("In outlining approaches and infusing discrimination claims
under the LAD with substantive content, we have adopted the

Supreme Court's analysis of unlawful discrimination claims brought under Title VII . . . .").

Moreover, before Staub was decided, another New Jersey appellate court adopted a "lenient" version of the cat's paw theory in the context of a wrongful termination claim under the LAD. Kwiatkowski v. Merrill Lynch, 2008 WL 3875417, *9 (N.J. App. Div. Aug. 13, 2008), cert. den'd, 962 A.2d 530 (N.J. 2008) (noting that the Third Circuit "endorsed such a lenient approach" and "predicted that the New Jersey Supreme Court would 'hold an employer liable for the discriminatory conduct of its supervisors irrespective of the knowledge of intent of the ultimate decision-makers'") (quoting Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 n.11 (3d Cir. 1996)). While that court did not use the "proximate cause" language of Staub, it held that a wrongful termination claim could survive where a supervisor's discriminatory animus "influenced or participated" in the adverse employment decision. Id. at *11.

Another New Jersey appellate court applied Staub in the analogous civil rights context of a retaliation claim under New Jersey's Conscientious Employee Protection Act ("CEPA"). Battaglia v. United Parcel Serv., Inc., 2011 WL 3516925, *10 (N.J. App. Div. Aug. 12, 2011), cert. granted, 36 A.3d 1064 (2012); see also Potena v. State, Bd. of Pub. Utilities, 2011 WL 2713438 (N.J. App. Div. July 14, 2011), cert. den'd, 36 A.3d 1064

(2012) ("Because CEPA is a civil rights statute, like the [LAD] and [Title VII], we employ the same analytical approach in CEPA cases as we employ in LAD and Title VII cases."). Thus, it appears likely that the New Jersey Supreme Court will adopt a standard similar to the "cat's paw" theory enunciated in Staub.

Amid Staub, Medco first argues that the facts, as admitted, fail to show any evidence that Rossino (or Greiner) harbored any animus toward Plaintiff. Second, Medco avers that even if the Court finds genuine issues of material fact as to Rossino or Greiner's motive, that neither was sufficiently involved in the decision to terminate plaintiff to impute their animus to Medco under a Staub or cat's paw analysis. The Court takes each assertion in turn.

### i. Intent

First, by crediting Plaintiff's testimony as it must, the Court finds that Plaintiff has proffered sufficient evidence to show intent at this stage of the proceedings. Two facts bring the Court to this conclusion. First, Rossino initiated the investigation into the complaint against Plaintiff despite hearing of the incident second hand and without a formal complaint by Harvey. Since termination is presumably often an outcome of internal investigations by a human resources division,

Rossino could have intended Plaintiff's termination by serving as the spark that ignited the investigation.

Second, Plaintiff proffers testimony that Rossino prevented him from denying Harvey's allegations during the only interview conducted with Plaintff. Though the parties' versions of this meeting differ substantially, Plaintiff alleges that as soon as he started to relate events of an interaction with Harvey Rossino stated "there it is" and then moved quickly to conclude the meeting without allowing the Plaintiff to offer a full version of the events. According to Plaintiff, Rossino and Greiner then reported to their superiors that Plaintiff had admitted to striking Harvey, triggering the termination decision. Medco vehemently denies Planitiff's version of events, stating that Plaintiff freely admitted to slapping Harvey in a full recitation of the incident. As such, Plaintiff has established that a genuine factual issue exists.

### ii.  Proximate Cause

Defendant Medco argues that even if animus or intent is found, that Rossino did not make the decision to terminate Plaintiff and therefore Medco cannot be liable for retaliation under <u>Staub</u>. However, Plaintiff has offered testimony to show that Rossino was involved in nearly every aspect of the investigation, including actually terminating the Plaintiff.

14

Specifically, Rossino initiated the investigation by calling
Greiner, he conducted the interviews alongside Greiner, he
communicated with Kaminski about the status of the
investigation and then granted his approval, when asked by
Kaminski, for Plaintiff's termination.

The Supreme Court in Staub cautioned, "it is axiomatic under
tort law that the exercise of judgment by the decision maker does
not prevent the earlier agent's action (and hence the earlier
agent's discriminatory animus) from being the proximate cause of
the harm. Proximate cause requires only "some direct relation
between the injury asserted and the injurious conduct alleged,"
and excludes only those "link[s] that are too remote, purely
contingent, or indirect." Staub at 1192. (internal citations
omitted) Moreover, "a cause can be thought "superseding" only if
it is a "cause of independent origin that was not foreseeable."
Id. (quoting Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830,
837(1996) (internal quotation marks omitted). Thus even if it was
a more senior member of Medco that ultimately authorized
Plaintiff's termination, this does not negate Rossino's
potentially discriminatory animus as another proximate cause of
Plaintiff's termination. As a result, the Court finds a genuine
factual dispute regarding Rossino's role in Plaintiff's
termination and DENIES summary judgment.

**B. Plaintiff's Request for Punitive Damages**

Medco also seeks dismissal of Plaintiff's request for punitive damages under the LAD.

Awards of punitive damages serve particular purposes, which include the "deterrence of egregious misconduct and the punishment of the offender." Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337-338 (1993). Specifically, the LAD "is to be liberally construed so that all common law remedies, including compensatory and punitive damages, are available to persons protected by the LAD." Gares v. Willingboro Tp., 90 F.3d 720 (3d Cir. 1996)(predicting that the NJ Supreme Court would hold that the LAD permits the recovery of punitive damages against public entities).

In the employment discrimination context, punitive damage awards should meet two requirements. First, punitive damages may be awarded for violations of the LAD when the "wrongdoers conduct is especially egregious." Lehman v. Toys 'R' Us, Inc., 132 N.J. 587, 626 A.2d 445, 464 (1993) (quoting Leimgruber v. Claridge Assocs., 73 N.J. 450, 375 A.2d 652, 654 (1997). Second, employers should be "liable for punitive damages only in the event of actual participation of upper management or willful indifference." Id. Notably, each is a difficult and fact-sensitive determination; "under New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the

16

defendant's conduct are questions for the finder of fact." <u>Weiss v. Parker Hannifan Corp.</u>, 747 F. Supp. 1118, 1135 (D.N.J. 1990).

Because this Court has concluded that issues of material fact persist and summary judgment for the Plaintiff's claims brought under the LAD is improper, it now remains for a jury to engage in the fact based analysis required to grant or deny punitive damages as a remedy.

### IV. CONCLUSION

For the foregoing reasons, the Court denies Medco's motion for summary judgment on Count III and punitive damages.  An appropriate Order will issue herewith.


<u>s/Renée Marie Bumb</u>
RENEE MARIE BUMB
United States District Judge

Date: <u> June 19, 2012</u>